## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **GLEN DALE HAMMON** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CIV-04-1007-HE** |
| | ) | |
| **DAVID MILLER,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner appearing pro se, brings this action pursuant to 28 U.S.C. § 2254 seeking a writ of habeas corpus.  United States District Judge Joe Heaton has re-referred the matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B).  In a previous Report and Recommendation, the undersigned recommended denial of the petition, and that recommendation was adopted by Judge Heaton.  However, Petitioner appealed, and the Tenth Circuit Court of Appeals reversed and remanded the matter for an evidentiary hearing on one issue: whether appellate counsel was ineffective for failing to assert that trial counsel operated under a conflict of interest.  The evidentiary hearing was conducted on June 6, 2007, and post-hearing briefs have been filed. For the reasons set forth below, it is recommended that the petition be denied.

By this action, Petitioner challenges his convictions by a jury for possession of a controlled dangerous substance, possession of a firearm by a convicted felon, and possession of a firearm with a defaced or mutilated serial number, after former conviction

of two felonies.[1]  Case No. CF-2000-6659, District Court of Oklahoma County. Petitioner was sentenced to twenty years imprisonment on the drug charge, fifty years imprisonment on the felon in possession charge, and twenty years imprisonment on the mutilated serial number charge, with the first two sentences to run consecutively to each other, but concurrently with the third.

## I.  PROCEDURAL HISTORY

Following his conviction Petitioner filed a direct appeal, and the Oklahoma Court of Criminal Appeals affirmed on April 1, 2003. Case No. F-2001-1496, Oklahoma Court of Criminal Appeals.[2] Petitioner filed an application for post-conviction relief, which was denied by the state district court on April 13, 2004.  Petitioner appealed, and the Oklahoma Court of Criminal Appeals affirmed on July 8, 2004.  Case No. PC-2004-513, Oklahoma Court of Criminal Appeals.

Petitioner then filed this action, raising seven separate grounds for relief.  In Ground One, Petitioner alleges ineffective assistance of appellate counsel.  Petition, p. 6. In Grounds Two, Three, and Six, Petitioner alleges ineffective assistance of trial counsel due to a conflict of interest. Petition, p. 8-10, 16.  In Grounds Four and Five, Petitioner alleges ineffective assistance of trial counsel due to counsel's performance at trial. Petition, p. 11, 14. In Ground Seven, Petitioner alleges that the prosecution knowingly allowed perjured testimony.  Petition, p. 18.

---

[1]One of the two previous felonies was an essential element of the possession of a firearm charge, so that conviction was only after former conviction of one felony.  Trial Tr.  307-08.

[2]The Oklahoma Court of Criminal Appeals did remand the matter to the state district court to correct a scrivener's error in the judgment and sentence.  Summary Opinion, p. 2 (Attached to Response as Ex. 3).

On March 14, 2005, the undersigned recommended that the petition for a writ of habeas corpus be denied.  In recommending denial of relief, the undersigned noted that Petitioner had procedurally defaulted the claims raised in Grounds Two through Seven of the petition, the Oklahoma Court of Criminal Appeals having found Petitioner's claims – other than his claim of ineffective assistance of appellate counsel – barred by Okla. Stat. tit. 22, § 1086.  The undersigned further found that this procedural bar rested on "independent and adequate" state grounds, and that federal habeas review of these claims was also barred unless Petitioner could "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991). Petitioner argued that his appellate counsel was ineffective as cause for default of his other grounds.

Accordingly, the undersigned turned to Petitioner's claim of ineffective assistance of appellate counsel, first noting that the Oklahoma courts had already addressed this claim and found that appellate counsel had submitted a well-written brief and served as an active advocate on Petitioner's behalf, and that Petitioner had failed to meet his burden of demonstrating that the results on appeal would have been more favorable had any additional issues been raised.

Turning first to Grounds Two, Three, and Six, in which Petitioner alleges ineffective assistance of counsel due to a conflict of interest, Petition, p. 8, 9-10, 16, the undersigned found that although there was a potential conflict of interest, there was nothing in the record showing a conflict of interest which adversely affected Petitioner's

counsel's performance. Thus, the undersigned found no merit to Petitioner's claim that his counsel had an actual conflict of interest, and that omission of claims based on such a conflict from the appeal did not constitute deficient performance.

The undersigned also concluded that appellate counsel was not ineffective for failing to raise the claims noted in Grounds Four, Five and Seven, finding them unsupported by the record and thus without merit. It should be noted that these claims are no longer at issue, as the Tenth Circuit Court of Appeals addressed only Petitioner's claim that trial counsel was ineffective due to a conflict of interest. Hammon v. Ward, 466 F.3d 919, 926 (10th Cir. 2006).

As there was no cause found that would excuse Petitioner's failure to raise Grounds Two through Seven, the undersigned proceeded to consider whether a fundamental miscarriage of justice would occur if the Court did not consider Petitioner's claims. Coleman, 501 U.S. at 750. Noting that to avail himself of this exception, Petitioner "must identify evidence that affirmatively demonstrates his innocence," Phillips v. Ferguson, 182 F.3d 769, 774 (10th Cir. 1999), the undersigned found that Petitioner had wholly failed to identify any such evidence. Accordingly, the undersigned found that the Oklahoma Court of Criminal Appeals' conclusion was neither contrary to nor inconsistent with federal law, and recommended that the petition be denied. Furthermore, it was recommended that Petitioner's request for an evidentiary hearing be denied as none of Petitioner's claims would entitle him to federal habeas relief even with the presentation of evidence.

Petitioner objected to the recommended disposition, and on April 22, 2005, after considering the matter de novo, Judge Heaton adopted the Report and Recommendation and denied both the petition and the request for an evidentiary hearing.

Petitioner then appealed, and the Tenth Circuit Court of Appeals reversed and remanded for an evidentiary hearing on the ineffective assistance/conflict of interest issue: "We conclude that if the facts are as Petitioner alleges them, then Petitioner is entitled to relief for ineffective assistance of appellate counsel for failure to assert that trial counsel operated under a prejudicial conflict of interest ...." Hammon, 466 F.3d at 926. Proceeding to the merits of the ineffective assistance of appellate counsel/conflict of interest claim, the Court stated:[3]

> To obtain relief for ineffective counsel, a petitioner must generally show both that his "counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." "When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, we look to the merits of the omitted issue." In conducting this review:
>
> > [i]f the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.
>
> Consequently, in this case, we must consider the merits of Petitioner's claim that his trial counsel was constitutionally ineffective because of a conflict of interest.

---

[3]In an effort to accurately and thoroughly address the concerns raised by the Tenth Circuit Court of Appeals, the undersigned has quoted extensively from that Court's decision on appeal.

Id. at 927-28 (citations omitted).  The Tenth Circuit then summarized the familiar test for

claims of ineffective assistance of counsel caused by a conflict of interest:

> The Supreme Court has held that a "conflict itself demonstrat[es] a denial
> of the 'right to have the effective assistance of counsel.' "Furthermore, "[a]
> defendant who shows that a conflict of interest actually affected the
> adequacy of his representation need not demonstrate prejudice in order to
> obtain relief." An "actual conflict of interest" cannot be demonstrated
> merely by "the possibility for conflict," nor may it be demonstrated by "the
> mere appearance of impropriety."  Instead, the Supreme Court has held that
> the claimant must show "that his counsel actively represented conflicting
> interests."

Hammon, 466 F.3d at 929 (citations omitted). The Tenth Circuit then framed the conflict

of interest issue as follows:

> Based on the trial record and Petitioner's affidavit, which he submitted to
> the state court, we interpret the alleged conflict as follows: Until Demarcus
> Hammon's plea agreement, the joint defense strategy upon which trial
> counsel was hired to represent the Hammon brothers was that the brothers
> would present a unified front in which Demarcus Hammon would take the
> full rap for the gun found in the vehicle, both men would disavow
> knowledge that there were drugs in the car (because it was not their car),
> and a witness (Damien Smith) would corroborate that Demarcus Hammon
> legitimately acquired the money found on him during the search. Trial
> counsel then negotiated a plea bargain with the State for Demarcus
> Hammon, in which the State agreed to recommend a five-year deferred
> sentence if, but only if, Demarcus Hammon agreed to inculpate Petitioner.
> Trial counsel never informed Petitioner that Demarcus Hammon had
> pleaded guilty, and, as a result, Petitioner declined a (much less favorable)
> plea offer of fifteen years in prison and proceeded to trial. At trial,
> Petitioner repeatedly asked trial counsel when Demarcus Hammon was
> going to testify. According to Petitioner, it was not until his trial was
> underway that his trial counsel finally informed him, *during* trial, that
> Demarcus Hammon had already pleaded guilty and thus would be unable
> to testify on Petitioner's behalf as planned because part of the plea bargain
> required Demarcus Hammon to inculpate Petitioner and Demarcus
> Hammon would receive prison time for lying if he reneged on that
> inculpation.

> If the facts are as Petitioner alleges, then trial counsel's performance was
> adversely affected by an *actual* conflict in this case regardless of whether

Demarcus Hammon ever actually inculpated Petitioner at trial. This is so because trial counsel could not simultaneously negotiate the most favorable deal for Demarcus Hammon-a five-year deferred sentence-without both disqualifying Demarcus Hammon from providing exculpatory testimony for Petitioner and, consequently, sabotaging Petitioner's most viable defense strategy and the defense that trial counsel was hired jointly to present for the Hammon brothers. Thus, once the State offered Demarcus Hammon the conditional plea bargain, Demarcus Hammon's interest in obtaining the most favorable plea bargain conflicted with Glen[ ] Hammon's interest in presenting his best defense. Yet, trial counsel continued actively to represent both Hammon brothers-negotiating the conditional plea for Demarcus Hammon and leading Petitioner to trial without the best witness (Demarcus Hammon) to create a reasonable doubt in the State's case. ("[D]efense counsel's performance [is] adversely affected by an actual conflict of interest if a specific and seemingly valid or genuine alternative strategy or tactic was available to defense counsel, but it was inherently in conflict with his duties to others or to his own personal interests.").

Where an actual conflict of interest adversely affects counsel's performance, as Petitioner's affidavit suggests here, "[n]o further showing of prejudice is necessary," [I]nstead, we presume prejudice.  In fact, here there is more than the general presumption of prejudice; here, there is evidence in the record of actual prejudice-trial counsel's candid statement on the record at trial that he had a conflict of interest based on his [dual] representation of the Hammon brothers and the associated problems that such representation presented once he negotiated a plea bargain for Demarcus Hammon.

Hammon, 466 F.3d at 929-31 (citation and footnote omitted).   The Tenth Circuit

concluded that it could not "resolve on the record before us whether Demarcus

Hammon's plea bargain contained an agreement that effectively prevented him from

providing statements exculpating Petitioner." Id. at 931.  It further concluded that if the

facts alleged by Petitioner are true then "trial counsel actively represented conflicting

interests and thus operated under an actual conflict." Id.  Finally, the Court summarized

as follows:  "Omitting 'an issue which was obvious from the trial record, *and* one which

would have resulted in a reversal on appeal,' Parker v. Champion, 148 F.3d 1219, 1221

(10th Cir.1998) (quotations omitted) (emphasis in original), constitutes ineffective

assistance of appellate counsel under any reasonable application of Supreme Court precedent to Petitioner's allegations in this case." Id. "We therefore conclude that the [Oklahoma Court of Criminal Appeals] either reached 'a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court' or 'that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" Id. (quoting 28 U.S.C. § 2254(d)).

Upon remand, this matter was referred to the undersigned for the purposes of conducting an evidentiary hearing, entry of appropriate orders, and for the preparation and submission of proposed findings and recommendations. [Doc. No. 30]. Counsel was appointed on behalf of Petitioner, and as noted, the hearing was conducted on June 6, 2007. Petitioner was present in person and by counsel. He testified on his own behalf, and called his brother, Demarcus Hammon, and direct appeal counsel Andreas Pitsiri as witnesses. Respondent called Petitioner's trial counsel, Eddie Jackson. Following the testimony of witnesses and introduction of exhibits, the hearing was concluded. At their request, the undersigned gave the parties the opportunity to brief the matter after completion of the hearing transcript. Post-hearing briefing has been completed by the parties, and so the matter is at issue and ready for disposition.

## II. BACKGROUND

The incident which led to Petitioner's trial and conviction occurred on October 19, 2000, when Officer Jay Hill of the Del City Police Department observed that the car being driven by Petitioner had malfunctioning brake lights. Trial Tr. 41, 43-44, 50. Officer Hill

initiated a traffic stop. Trial Tr. 50-51. The car pulled into a residential area and then all the way into a driveway to one of the homes. Trial Tr. 51, 54. Both occupants exited the car: Petitioner approached the door to the residence, while the passenger – Petitioner's brother and co-defendant – started walking away. Trial Tr. 54, 64.[4] Officer Hill ordered both men back into the car three or four times, and they finally complied. Trial Tr. 54-55. Officer Hill then approached the driver's side of the car and asked Petitioner for his driver's license and insurance; Petitioner told Officer Hill that he had neither. Trial Tr. 56, 58-59. Officer Hill then went back to his car and radioed the dispatcher to make sure that Petitioner did not have a driver's license or any outstanding warrants. Trial Tr. 59. As he was speaking to the dispatcher, he observed Petitioner and his brother moving and fidgeting in the vehicle; he could tell from their shoulder movements that their hands were moving. Trial Tr. 60-61. For that reason, Officer Hill called for backup before approaching the vehicle again. Trial Tr. 61. When the other officer arrived, Officer Hill approached Petitioner and placed him under arrest for driving without a license and for an outstanding warrant. Trial Tr. 62. The other officer took the passenger from the car. Trial Tr. 63. Because there was no insurance on the vehicle, and also because it was determined that the passenger's driver's license had been suspended, the car was impounded. Trial Tr. 65. During Officer Hill's impound inventory of the vehicle, he noticed that the glove box had been pulled from the dashboard, and was hanging loose by a wire. Trial Tr. 66. In the compartment where the glove box would normally be, he noticed the top part of a plastic zipper bag. Trial Tr. 71-72. When he removed the plastic

---

[4]An elderly couple lived at the residence and they did not know either the Petitioner or his brother. Trial Tr. 83-84.

zipper bag, he found that it contained thirteen to fourteen small rocks of what appeared to be crack cocaine. Trial Tr. 73-74.  A field test conducted by Officer Hill on one of the rocks revealed the presence of cocaine, Trial Tr. 74, and a later test by the Oklahoma State Bureau of Investigation showed the rocks to be crack cocaine.  Trial Tr. 170, 173, 175. Officer Hill also discovered a loaded handgun under the passenger seat. Trial Tr. 67. The gun's serial number had been partially removed.  Trial Tr. 84.

## III.  FINDINGS OF FACT

Having observed the witnesses and heard their testimony at the evidentiary hearing, and having reviewed the exhibits as well as the original trial transcript, the undersigned finds the facts to be as follows.

Eddie Jackson was hired by the Hammon brothers following their first court date; the brothers' mother referred Mr. Jackson and he was initially retained to represent them through the preliminary hearing stage.  Evid. Hr'g 25, l. 21-23; 140, l. 9-13.  The brothers had originally been represented by the same public defender, Malcomb Savage.  Evid. Hr'g 150, l. 23-25; 151, l. 1-6.  Mr. Jackson thought that both matters would result in a guilty plea. Evid. Hr'g 140, l. 11-12.  The reason Mr. Jackson thought this, was that the evidence against the brothers was such that Mr. Jackson believed that if they went to trial, the likelihood of a conviction was very high, and that they would get a better deal through plea negotiations.  Evid. Hr'g 203, l. 5-11.  He talked to the Petitioner's girlfriend, whose car Petitioner was driving at the time of the arrest, and she would not have helped the brothers with her testimony.  Evid. Hr'g 203, l. 12-21.  She told Mr. Jackson that she knew nothing about the gun or the drugs and if they were found in her car, Petitioner and

his brother had to have put them there.  Evid. Hr'g 203, l. 19-21.  Mr. Jackson chased down leads provided to him by Petitioner and his brother and he felt like there were no other alternatives for where the gun and drugs came from.  Evid. Hr'g 204, l. 5-10.  Mr. Jackson knew from the beginning he had a potential conflict.  Evid. Hr'g 140, l. 14-18. He discussed the potential conflict with the Petitioner, Demarcus, his colleagues, and in a phone call to the Oklahoma Bar Association.  Evid. Hr'g 140, l. 19-23. At the initial meeting, Mr. Jackson recalled a discussion with the Hammon brothers regarding a joint strategy in which both would disavow knowledge and possession of the drugs, and Demarcus would claim possession of the gun.  Evid. Hr'g 153, l. 15-25; 154, l. 1-8. However, shortly after his arrest, Demarcus gave a statement to police in which he stated that Petitioner handed him the drugs at the time of the stop and asked him to hide them; in that same statement, he admitted that the gun belonged to him (Demarcus).  Evid. Hr'g 19, l. 4-25; 20, l. 1-10. The initial meeting Mr. Jackson had with the brothers could have been before he received a copy of the Information that had a copy of the probable cause affidavit referencing Demarcus' statement, and Mr. Jackson testified that "[t]hese two defendants, like many defendants, will change their recollection of events as the case moves along."  Evid. Hr'g 187, l. 2-9.

According to Mr, Jackson, there never was a strategy whereby Demarcus would be a witness on Petitioner's behalf, either before or after Demarcus pleaded guilty. Evid. Hr'g 142, 11-16, 22-25; 143, l. 1-4; 153, l. 1-5. Demarcus could not recall any discussion of a trial strategy, only that Mr. Jackson told him "off the bat" that he could get him a deferred sentence.  Evid. Hr'g  27, l. 18-25; 28, l. 1-4. Mr. Jackson did not plan to use Demarcus

as a witness because whatever help Demarcus could provide with regard to the gun charge would have been outweighed by the harm his testimony would have caused with regard to the drug charge.  Evid. Hr'g  143, 1-11.  The summary of facts portion of Demarcus' plea agreement in which he stated that he and Petitioner both possessed the drugs and the statement Demarcus made to the police shortly after his arrest were essentially the same, at least insofar as they both inculpated Petitioner with regard to the drugs.  Evid. Hr'g  186, 5-25; 187, 1.  Although he could not recall at first, Mr. Jackson later agreed after his memory was refreshed through review of Petitioner's preliminary hearing testimony that he was aware at least by then of Demarcus' initial statement that the gun belonged to Demarcus and the drugs were given to him by Petitioner to hide when they were stopped, and probably had the statement as part of the Information from the time the public defender turned his file over to him.  Evid. Hr'g  183, 6-25; 184, l. 1; 185, l. 23-25; 186, l. 1-21.  Thus, at the time Mr. Jackson was negotiating the plea agreement for Demarcus there was no intention to call him as a witness for Petitioner. Evid. Hr'g 208, l. 15-18.  Even if Demarcus had not pleaded guilty, Mr. Jackson would not have considered it a viable defense strategy to call Demarcus as a witness for Petitioner because he would inculpate him on the drugs – it would have been "fatal" in Mr. Jackson's words – and that probably also would have affected his credibility with regard to his statement that the gun was not Petitioner's.  Evid. Hr'g  188, 8-23; 192, l. 7-10.  Mr. Jackson's trial  strategy was to discredit Officer Hill as to the pretext for the stop, rigorously cross-examine those in the chain of evidence, and to argue Petitioner's lack of knowledge of and proximity to the drugs and the gun. Evid. Hr'g 144, 1-25; 146, l. 9-13.

Mr. Jackson also called the Hammon brothers' mother to testify that Petitioner told her that Demarcus had confessed to possessing the gun.  Evid. Hr'g 145, 7-22; 146, 3-13; see also Trial Tr. 193, l. 19-25; 194, l. 10-22.  Thus, he was able to get this information in front of the jury without Demarcus' testimony and without exposing Petitioner to Demarcus' testimony that the drugs were Petitioner's.  Mr. Jackson was of the opinion that Demarcus' testimony would hurt this strategy – particularly that with regard to Petitioner's lack of knowledge of the drugs – due to his previous statements.  Evid. Hr'g 146, l. 19-24.

Mr. Jackson testified that Demarcus felt like Petitioner wanted him to take the blame on all the charges, and this created conflict between Petitioner and Demarcus. Evid. Hr'g 147, 14-21. However, Mr. Jackson recalled no conversations with Demarcus in which he claimed that he made a false statement to police regarding the drugs after being told by the police that Petitioner was trying to blame him for everything.  Evid. Hr'g 165, 1-19.  The terms of the plea agreement neither required Demarcus to testify for the State nor precluded him from testifying in favor of Petitioner.  Evid. Hr'g 189, 21-25; 190, l. 1-11; 192, l. 15-17.  The State did however, require Demarcus to inculpate Petitioner with regard to the drugs in order to get the plea agreement.  Evid. Hr'g  159, l. 20-24. However, this was consistent with the statement Demarcus made to the police when he was arrested.  Mr. Jackson recalled negotiating with the district attorney's office on three possible agreements before settling on one. Evid. Hr'g  159, 1-19; 209, l. 12-25; 210, 1-8.

Had Demarcus' summary of facts been admitted in Petitioner's trial, Mr. Jackson would have been in the position of impeaching his statement.  Evid. Hr'g  172, l. 6-16;

173, l. 1-4.  Petitioner was informed sometime prior to the court proceeding in which Demarcus pleaded guilty that he was going to do so, and he knew that he had before his own trial. Evid. Hr'g 151, l. 7-9, 13-17. Petitioner testified that he learned of the plea in which Demarcus had been offered a deferred sentence a couple of months after he had been in jail. Evid. Hr'g 103, l. 19-25.  The brothers were arrested on October 19, 2000, and Demarcus pleaded guilty on January 19, 2001.  Def. Exs. 1 and 2.  Thus, Demarcus had already pleaded guilty at the time of Petitioner's preliminary hearing on February 13, 2001.  Evid. Hr'g  178, 9-22. Petitioner testified that he did not know that Demarcus had to implicate him in order to get the deferred sentence, and that he did not learn that Demarcus would not be a witness until his trial had already begun. Evid. Hr'g 105, l. 14-19; 106, l. 17-24.  However, Mr. Jackson testified more credibly that he told Petitioner at least a couple of weeks before trial that Demarcus would not be a witness for them. Evid. Hr'g  207, l. 10-25; 208, l. 1-6.

Because the initial thinking was that both brothers would plead guilty, no trial strategy was discussed until after Demarcus pleaded guilty and Mr. Jackson explained to Petitioner that he could not get a similar deal due to his prior convictions.  Evid. Hr'g 152, l. 2-7.   Prior to his trial, Petitioner was offered a plea in which he would serve 15 years imprisonment, and Mr. Jackson recommended that he accept it.  Evid. Hr'g  148, l. 13-18.  Petitioner turned down the offer because he wanted the same deal as Demarcus or at least some agreement for less than 15 years.  Evid. Hr'g 177, l. 22-25; 178, l. 1-2.  He also thought he could persuade the jury through his testimony to acquit him.  Evid. Hr'g 148, l. 23-25; 149, l. 1-18.  Mr. Jackson had Petitioner sign a letter acknowledging his

rejection of the plea offer, and his understanding that he would be likely to get more time in prison if he went to trial.  Evid. Hr'g 108, 11-25; 148, l. 17-22; Def. Ex. 7.  Mr. Jackson tried to negotiate a plea on behalf of Petitioner whereby Petitioner would only plead to the drug charge since Demarcus took the blame for the firearm, but the State would not agree to that.  Evid. Hr'g 213, l. 1-8.  Mr. Jackson ultimately persuaded him that he could not testify due to his prior convictions for Murder II and discharging a firearm from a moving vehicle.  Evid. Hr'g 152, l. 8-22; 95, l. 22-24; 115, l. 3-10.  There was no discussion at that time about whether Demarcus was going to be a witness for Petitioner. Evid. Hr'g 177, l. 17-25; 178, l. 1-2.  At the time of Petitioner's trial, Petitioner may have asked Mr. Jackson when Demarcus was going to testify; if so, Mr. Jackson's response would have been that if he testified, he would be called by the State and that the defense has no control over that.  Evid. Hr'g  177, 1-11.

Mr. Jackson acknowledged that he told the trial court that he had a potential conflict of interest, but testified at the evidentiary hearing that he believed the conflict of interest issue was resolved when the State decided not to introduce Demarcus' plea paperwork.  Tr. 179, l. 17-20.  At Petitioner's trial in December of 2001, the State had unsuccessfully attempted to serve Demarcus with a subpoena to testify on its behalf. Trial Tr. 184-85, 218-19. After the defense rested, the State sought to reopen to offer rebuttal evidence in the form of the factual basis for Demarcus' plea.  Trial Tr. 219. When asked for his position, Petitioner's counsel asked that the jury be informed that Demarcus "had an agreement to his benefit with the district attorney that the court approved."  Trial Tr. 219, l. 15-21.  After discussing the fact that the only plea agreement noted in the

15

paperwork was that "I'm pleading guilty to Possession of CDS and Possession of a Firearm in exchange for a five-year deferred sentence, treatment per DOC or community sentencing or CS, . . . 100 hours of community service, $200 VCA, and $200 mental health assessment," Trial Tr. 220, l. 7-12, Petitioner's counsel stated that Demarcus would not have gotten the sentence he did if he had not inculpated Petitioner.  Trial Tr. 221, l. 2-3.  The following colloquy ensued:

> [PETITIONER'S COUNSEL]: Well, I have a bit of a conflict of interest, Your Honor, in that I was the attorney as well.

> THE COURT: That's your - -

> [PETITIONER'S COUNSEL]: And that's something I need to - - I need to inform the court of that.  All kinds of contradictions.

> THE COURT: Well, are you saying to this court that it was your understanding that unless he inculpated his co-defendant that he could not plea?

> [PETITIONER'S COUNSEL]: Your Honor, in a sense I must be truly careful because I could get myself in a position where I - - in the interest of attorney/client privilege.

> THE COURT: No.  I'm saying, was there an agreement with the state?  That wouldn't be an attorney/client privilege.  It's an agreement with the State of Oklahoma that he implicate the co-defendant in return for the five-year deferred sentence. Was there an agreement along those lines? I'm not talking about what you and your client discussed;  I'm talking about you and the state had an agreement on.

> [PETITIONER'S COUNSEL]: The problem that I'm having is I'm not sure - - I'd like to think a moment before I agree that that's not attorney/client because it began with the client and I.

> [THE PROSECUTOR]: Did you discuss with - -

> [PETITIONER'S COUNSEL]: Negotiated - - it was negotiated with the state.

THE COURT: Well, I'm asking about your discussions with the State of Oklahoma. Did the State of Oklahoma say to you, Your client, Mr. Demarcus Hammon, must inculpate his co-defendant in return for this recommendation of a five-year deferred?

[PETITIONER'S COUNSEL]: That's correct.

THE COURT: You're saying that the State of Oklahoma said that?

[PETITIONER'S COUNSEL]: on the CDS charge.  And it was a negotiated matter, Your Honor, and - -

Trial Tr. 221, l. 7-25; 222, l. 1-19.  Counsel and the Court continued to discuss whether the matter of the agreement to inculpate Petitioner could be placed before the jury in the absence of Demarcus, since the agreement that he must inculpate Petitioner did not appear in the paperwork.  At that point, Petitioner's counsel added: "Your Honor, there was much discussion about this because - - I represented both of them and we were getting close to a point during the negotiations where if their interest became adverse, I would have to - - certain decisions in terms of control. And the district attorney knew that. That was part of the negotiation." Trial Tr. 223, l. 17-23.  The Court then suggested that the jury could be told that the factual basis was made in connection with a plea, and that there was a plea bargain with the State that if Demarcus pleaded guilty, he would receive five years probation, leaving Petitioner's counsel free to argue that the only reason Demarcus implicated his brother was to get that sentence. Trial Tr. 229, l. 21-25; 230, l. 1-10. However, despite all of this discussion, Demarcus' statement was never offered by the State.

Andreas Pitsiri of the Oklahoma Indigent Defense System  (OIDS) represented Petitioner on appeal.  Evid. Hr'g  47, l. 12-14.  Initially, Billy Baze of OIDS represented

Petitioner, but the case was reassigned to Mr. Pitsiri. Id. at l. 15-21. After being assigned.

Mr. Pitsiri read the entire record, the whole trial transcript, as well as the correspondence

addressed both to Mr. Baze and himself. Evid. Hr'g 47, l. 22-25; 48, l. 1-4; 50, l. 25; 51,

l. 1-2; 81, l. 23-24.  Mr. Pitsiri prepared the brief on appeal.  Evid. Hr'g 47, l. 15-25; 48,

l. 1-4.   There was correspondence from Petitioner in the file regarding potential

ineffective assistance issues, Evid. Hr'g 48, l. 14-25; 49, l. 1-5. However, Mr. Pitsiri could

not point to any correspondence dated prior to the date the brief in chief was filed that

specifically raised a conflict of interest issue.  Evid. Hr'g 68, l. 10-19.  Demarcus' plea

paperwork was a part of the appeal file.  Evid. Hr'g  49, l. 6-9.  Mr. Pitsiri did not recall

at the hearing whether the plea paperwork raised any red flags in his mind regarding a

conflict of interest issue, but his file indicates that he did give consideration to the

ineffective assistance issue.  Evid. Hr'g 50, l. 17-24; 52, 19-25; 53, 1-9.  Mr. Pitsiri did not

recall why, but his notes indicate he did not raise the issue because he considered it to

be meritless.  Evid. Hr'g  53, l. 3-12.  Mr. Pitsiri could not recall with certainty whether

such was the sole reason, but his notes indicated that the conflict of interest issue was

not raised because the State did not pursue introducing Demarcus' plea paperwork.  Evid.

Hr'g  55, l. 5-19.  His notes state that the factual basis of Demarcus' plea was not brought

out at trial, that it contained both inculpatory and exculpatory language, and that he

"researched these points and decided that, based on the law, they were meritless."  Evid.

Hr'g  56, l. 8-24; 81, l. 23-25; 82, l. 1-4.

Mr. Pitsiri did not recall whether he looked at the conflict of interest issue from

the standpoint of whether Mr. Jackson was unable to call Demarcus to exculpate

Petitioner with regard to the gun because it would imperil his plea. Evid. Hr'g  57, l. 11-

22. Mr. Pitsiri acknowledged receiving a proposed pro se appellate brief from Petitioner that contained several potential ineffective assistance issues including "[c]onfession to trial judge of including appellant in charge to get co-defendant five-year defer," which he acknowledged appeared to be related to a conflict of interest issue.  Evid. Hr'g  60, l. 10-25; 61, 1.  However, Petitioner conceded on cross-examination that he did not recall ever telling his appellate attorneys that Demarcus was supposed to be a witness on his behalf, and also conceded that he did not believe the "confession to trial judge" issue in his proposed pro se brief was enough information to inform Mr. Pitsiri that he believed his trial counsel had a conflict of interest.  Evid. Hr'g 127, l. 24-25; 128, l. 1-14. Mr. Pitsiri did not file the proposed pro se brief because it was received in his office more than 60 days after the brief in chief had been filed, procedurally beyond what the Oklahoma Court of Criminal Appeals' rules allowed.  Evid. Hr'g  65, 9-22.  The brief filed by Mr. Pitsiri raised two issues, only one of which was substantive: sufficiency of the evidence, and a scrivener's error on a statute number.  Evid. Hr'g  62, 7-24.

Prior to filing his brief, Mr. Pitsiri did not have any conversation or correspondence with Mr. Jackson, and he did not review Mr. Jackson's file. Evid. Hr'g 53, l. 13-25; 54, l. 1-7.  He also did not have any contact with Demarcus Hammon.  Evid. Hr'g 54, l. 8-14.  He testified it was not unusual to have not contacted Mr. Jackson or Demarcus.  Evid. Hr'g  72, l. 18-25; 73, l. 1-6. Mr. Pitsiri did not recall speaking to Petitioner, but there was some indication in his file that a call was made; Petitioner remembers one five-minute telephone call.  Evid. Hr'g  61, l. 2-15; 120, l. 16-25.

Because the information was included in the file, Mr. Pitsiri would have read the portion of the affidavit of probable cause pertaining to Demarcus, including his statement

that the gun belonged to him and the cocaine was given to him by Petitioner to hide when they were stopped.  Evid. Hr'g 71, l. 19-25; 72, l. 1-7.  Mr. Pitsiri does not recall anything that would have kept him from doing proper research or preparation in Petitioner's case, and if additional time had been needed he could have moved for an extension of time to file the brief in chief.  Evid. Hr'g  87, l. 23-25; 88, l. 1-7.  Also, had he found any meritorious issue in the pro se brief proposed by Petitioner, he would have tried to raise the issue although it was out of time. Evid. Hr'g  88, l. 8-20.

Demarcus Hammon testified that he had no prior felony convictions at the time he and Petitioner were arrested.  Evid. Hr'g 14, l. 8-10.  He testified consistent with the statement he gave to the police and with his statement upon entering his guilty plea that the firearm was his.   Evid. Hr'g 16, l. 19-20.   He bought it from a guy "in the neighborhood" whose name he did not remember.  Evid. Hr'g 16, l. 21-24.  He could not recall if it was a .22 or .25 caliber firearm.  Evid. Hr'g 16, l. 25; 17, l. 1.  Although he told the police that Petitioner had passed the cocaine to him to hide, he claimed at the evidentiary hearing that this was not true.  Evid. Hr'g 20, l. 5-20.  He stated that had he been called as a witness at Petitioner's trial, he would have testified that the firearm was his and to his knowledge, Petitoner knew nothing about the firearm or the drugs.  Evid. Hr'g 33, l. 21-25; 34, l. 1-24.  He would have testified that he told the police the story about Petitioner passing the drugs to him because the drugs were inside the car and he was afraid of going to prison.  Evid. Hr'g 34, l. 13-15.  He testified that the statement he made to the court under oath when he plead guilty was false.  Evid. Hr'g 39, l. 2-8.[5]

---

[5]Interesting, Mr. Jackson implied that had Demarcus testified that the Petitioner had no knowledge of the drugs, he would not have been truthful.  Evid. Hr'g 164, l. 6-25, particularly l. 18-25.

## III. STANDARD GOVERNING PETITIONS FOR HABEAS CORPUS FOLLOWING AN EVIDENTIARY HEARING

Ordinarily, for factual and legal issues that have already been adjudicated in state court, the Court may only grant a writ of habeas corpus if that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1) and (2).  However, the Tenth Circuit has held that such deference does not apply where the federal court holds an evidentiary hearing:

> We do not apply AEDPA's deferential review standard when a federal district court holds an evidentiary hearing and considers new evidence that was not before the state court at the time it reached its decision, even if the state court resolved the claim on the merits. Id. (citing Bryan v. Mullin, 335 F.3d 1207, 1215-16 (10th Cir.2003) (en banc)). When a petitioner seeks relief under the second prong of AEDPA, the petitioner bears the burden of showing by clear and convincing evidence that the state court's factual determination is erroneous. 28 U.S.C. § 2254(e)(1); Turrentine, 390 F.3d at 1188-89. We review the district court's application of AEDPA's standards de novo. Goss v. Nelson, 439 F.3d 621, 626 (10th Cir.2006).

Young v. Sirmons,  486 F.3d 655, 663 (10th Cir. 2007); Hammon, 466 F.3d at 928 n.9.

## IV. DISCUSSION

As noted by the Tenth Circuit, Petitioner "must establish that (1) counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different." Hain v. Gibson, 287 F.3d 1224, 1231 (10th Cir. 2002). Application of this standard to ineffective assistance of appellate counsel claims requires us to "look to the merits of the omitted issue." Id.

> If the omitted issue is so plainly meritorious that it would have been
> unreasonable to winnow it out even from an otherwise strong appeal, its
> omission may directly establish deficient performance; if the omitted issue
> has merit but is not so compelling, the case for deficient performance is
> more complicated, requiring an assessment of the issue relative to the rest
> of the appeal, and deferential consideration must be given to any
> professional judgment involved in its omission; of course, if the issue is
> meritless, its omission will not constitute deficient performance.

Cargle v. Mullin, 317 F.3d 1196, 1202 (10th Cir. 2003) (quoting Neill v. Gibson, 278 F.3d

1044, 1057 (10th Cir. 2001)); accord Miller v. Mullin, 354 F.3d 1288, 1298 (10th Cir.

2004). Unless there is a reasonable probability that the omitted claim would have

resulted in Petitioner obtaining relief on appeal, there is no ineffective assistance of

appellate counsel under the Sixth Amendment. Neill,  278 F.3d at 1057 n. 5.

### A.  What the Evidentiary Hearing Revealed Regarding Petitioner's Allegations

In its decision on appeal, the Tenth Circuit Court of Appeals held that if the facts

were as Petitioner alleged, then trial counsel's performance was adversely affected by an

actual conflict regardless of whether Demarcus ever inculpated Petitioner at trial (either

as a witness or through the factual basis for his plea of guilty).  However,  the facts as

found by the undersigned were not entirely consistent with Petitioner's allegations.  The

conflict of interest issue, as interpreted by the Tenth Circuit Court of Appeals was based

upon the following allegations by Petitioner.

**1.  Until Demarcus' plea, the joint defense strategy was that the brothers
would present a unified front in which Demarcus would take the "full
rap" for the gun found in the vehicle and both men would disavow
knowledge that there were drugs in the car.**

Although this statement is true insofar as it goes, it leaves out important details.

First, as found above, Mr. Jackson was initially retained to represent the brothers through

the preliminary hearing stage with the thought that both would plead guilty.  Although

Mr. Jackson acknowledges that this "defense" strategy was discussed in their initial meeting, he also testified credibly that this initial defense strategy could have been before he had received a copy of the Information and was aware of the probable cause affidavit reflecting that Demarcus had told police that Petitioner handed him the drugs to hide at the time they were stopped,  and that these two defendants like many "will change their recollection of events as the case moves along." Evid. Hr'g 187, l. 2-9.  Furthermore, Mr. Jackson testified at the evidentiary hearing that there never was a strategy that involved Demarcus testifying on behalf of Petitioner.

> **2.  Trial counsel then negotiated plea bargain for Demarcus in which the State recommended five-year deferred sentence but only if Demarcus would inculpate Petitioner.**

This is true, according to the facts adduced at the evidentiary hearing and the colloquy at trial.  Specifically, Mr. Jackson stated that he had to negotiate with the State in order to receive the five-year deferred offer, ending with the State's agreement to accept a statement by Demarcus (consistent with his previous inculpatory statement to police) that the drugs belonged to both he and Petitioner.  However, the State did not require Demarcus to make any statements against the Petitioner to get the five year deferred sentence that he had not already made.  Evid. Hr'g 186, l. 22-25; 187, l. 1.

> **3.  Trial counsel never informed Petitioner that Demarcus had pleaded guilty, and as a result, Petitioner turned down a much less favorable plea offer of fifteen years.**

This is untrue.  Petitioner testified in the evidentiary hearing that he learned of Demarcus' plea agreement a couple of months after he had been in jail, and Mr. Jackson testified that Petitioner learned of the plea prior to the court proceeding in which it was accepted.  This was before Petitioner's preliminary hearing in February of 2001, and

eleven months before his trial.  Petitioner did not turn down his favorable plea offer because he was not informed of Demarcus' plea.  He turned it down because he wanted the same plea agreement that Demarcus received or something more favorable than 15 years, and he believed he could persuade the jury if he testified.  He also believed there were some weaknesses in the State's case.

**4.  At trial, Petitioner repeatedly asked trial counsel when Demarcus would testify.**

Mr. Jackson never intended to call Demarcus as a witness, and even had Demarcus not received the plea agreement, Mr. Jackson testified that it would not have been a viable defense strategy to call him as a witness.  Had he called Demarcus as a witness at Petitioner's trial, Mr. Jackson believed that any help he could offer on the gun charges was outweighed by the damage his testimony would do to Petitioner on the drug charge.

Mr. Jackson told Petitioner at least two weeks before trial that Demarcus would not testify as a defense witness.  He did not recall Petitioner asking about when Demarcus would testify after the trial started, but if he did, Mr. Jackson would have told him that would be up to the State and would be something the defense had no control over.  It is not credible that Petitioner believed at the time of trial that Demarcus was to be a defense witness.

**5.  It was not until trial was underway that trial counsel finally informed Petitioner that Demarcus had pleaded guilty and part of plea bargain required him to inculpate Petitioner and Demarcus would receive prison time if he "reneged on that inculpation."**

Once again, this was not what the evidentiary hearing revealed.  By the time of his trial, Petitioner had been aware for months that Demarcus had pleaded guilty.  There is

nothing showing that Demarcus would receive "prison time" if he testified;[6] he was not required to testify either for the State or prohibited from testifying for the defense as part of his plea agreement.  Petitioner was aware at least two weeks before his trial that Demarcus would not be testifying as a defense witness.

The facts being different than those alleged by Petitioner significantly affects the analysis of the conflict of interest issue. According to the Tenth Circuit Court of Appeals, if the facts alleged by Petitioner had been true, then trial counsel's performance was affected by an actual conflict:

> because trial counsel could not simultaneously negotiate the most favorable deal for Demarcus Hammon – a five-year deferred sentence – without both disqualifying Demarcus Hammon from providing exculpatory testimony for Petitioner and, consequently, *sabotaging Petitioner's most viable defense strategy* and the defense that trial counsel was hired jointly to present for the Hammon brothers.  Thus, once the State offered Demarcus Hammon the conditional plea bargain, Demarcus Hammon's interest in obtaining the most favorable plea bargain conflicted with Glen[ ] Hammon's interest in presenting his *best defense*.   Yet, trial counsel continued actively to represent both Hammon brothers – negotiating the conditional plea for Demarcus Hammon and leading Petitioner to trial without the *best witness* (Demarcus Hammon) to create a reasonable doubt in the State's case.

Hammon, 466 F.3d at 930 (emphasis added).

In fact, Mr. Jackson was able to negotiate the five-year deferred sentence for Demarcus without disqualifying him from providing exculpatory testimony and supposedly "sabotaging Petitioner's most viable defense strategy" because (1) the statement made by Demarcus in his plea summary was no more inculpatory than the statement he had already given to the police; and (2) calling Demarcus as a trial witness for Petitioner was never a part of the defense strategy because his testimony would be

---

[6]He could have been subject to prosecution for perjury however, if he testified differently than the statement he gave under oath when he plead guilty.

"fatal" to the defense on the drug charge, and the impeachment of Demarcus on the subject of the drugs would potentially harm his exculpatory testimony regarding the gun. Thus, Mr. Jackson was not forced to make choices advancing Demarcus' interests to the detriment of Petitioner.  Granted, had the plea summary of facts been admitted, Mr. Jackson would have been faced with the choice of having to impeach his own client's (Demarcus') testimony in order to advance Petitioner's interests.   Although the Tenth Circuit characterizes Demarcus as the "best" witness for Petitioner, Mr. Jackson's testimony at the evidentiary hearing was that he was not the best witness, in fact, not even a witness he planned to call.  Mr. Jackson's testimony was credible and persuasive – particularly after the undersigned had the opportunity to observe Demarcus' demeanor vis a vis that of Mr. Jackson.  Further, the potential penalties for the drug and gun charges were very similar.

In summary, the evidentiary hearing revealed that Demarcus' trial testimony was never part of Mr. Jackson's strategy and the undersigned finds his trial strategy to be sound.  Petitioner was driving a borrowed car in which the drugs and gun were found on the passenger side, which was occupied by Petitioner's brother Demarcus.  Through the testimony of Petitioner's mother, Evan Smith – and without the risk of inculpatory testimony regarding the drugs – Mr. Jackson was able to get in evidence that the car Petitioner was driving was borrowed, and that Petitioner had told her that the gun was not his, but belonged to Demarcus.  Trial Tr. 193, l. 16-25; 194, l. 1-22; 195, l. 18-25.  Her testimony regarding the gun was bolstered further when a letter Petitioner had written to the District Attorney was admitted after being offered by the State during its cross-examination of Mrs. Smith.  Trial Tr. 201, l. 9-14.  In that letter, Petitioner states that

Demarcus confessed to the gun "on the spot." Id. at 202, l. 1-17. Thus, Mr. Jackson's strategy was to try to create a reasonable doubt in the jurors' minds as to whether Petitioner possessed either the firearm or the drugs. Having seen the witnesses testify and knowing the evidence from the trial, the undersigned fully agrees with Mr. Jackson's strategy of never intending to call Demarcus as a witness for Petitioner.

Thus, when Mr. Pitsiri reviewed the case file for purposes of appeal, what he saw was a reasonable strategy – not one in which Petitioner's "best witness" was inexplicably missing. While both Mr. Jackson and Mr. Pitsiri candidly admitted under questioning that hindsight might affect their decisions today, Evid. Hr'g 92, l. 13-18; 194, l. 4-25; 195, l. 1-7, hindsight is not what governs the evaluation of counsel's performance. Strickland v. Washington, 466 U.S. 668, 689 (1984) ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

**B. Whether Appellate Counsel was Ineffective for Failing to Raise Ineffective Assistance of Trial Counsel due to a Conflict of Interest**

The Tenth Circuit found that *if* the facts as alleged by Petitioner are true, then he has shown that trial counsel operated under an actual conflict and "[o]mitting 'an issue which was obvious from the trial record, *and* one which would have resulted in a reversal on appeal'" is ineffective assistance of appellate counsel. Hammon, 466 F.3d at 931. Of course the facts are not as Petitioner alleges, and so the Court must next consider whether omission of the conflict of interest issue was ineffective assistance of appellate counsel in light of the most recent findings.

27

### 1.  Appellate Counsel's Actions in Light of the Record

Mr. Pitsiri testified that he had the entire file and transcript, as well as correspondence written to both him and first appellate counsel, Mr. Baze, and that he reviewed all of this before proceeding with the appeal.  The record and trial transcript revealed that Demarcus had made a statement to the police that Petitioner gave him the drugs to hide when they were stopped.   It revealed that Demarcus had then pleaded guilty, making a similarly inculpatory statement regarding his joint possession of the drugs with Petitioner.  Finally, it revealed the colloquy between Mr. Jackson and the trial court regarding the possible conflict if Demarcus' plea summary of facts were admitted – revealing that Mr. Jackson believed he would be forced to impeach Demarcus' statement by showing that his deferred sentence was in exchange for his statement inculpating Petitioner with regard to the drugs.  In connection with that, the State represented that there was no cooperation agreement, and that apparently no one involved in the colloquy perceived there to be a conflict problem if the paperwork were not admitted.

The correspondence available to Mr. Pitsiri, whether written to him by Petitioner or originally written by Petitioner to Mr. Baze, does not indicate any  "conflict" issue prior to the appellate brief being written, and the only arguable "conflict" issue mentioned in the proposed pro se supplemental brief is this: "confession to trial Judge of including appellant in charge to get codefendant 5 years deferr."  Def. Ex. 4, p. 5.  Even Petitioner conceded this was probably not enough information to apprise counsel of the conflict issue.  It certainly does not refer to Demarcus being a possible witness who became unable to testify as a result of the plea agreement. The undersigned asked Mr. Pitsiri if anything in his file indicated that Petitioner advised Mr. Pitsiri of a potential

conflict of interest. Mr. Pitsiri pointed out a letter that Petitioner wrote on February 15, 2002, in which Petitioner stated:

> Sir, violation of confrontation clause is also present. Statement made by co-defendant was submitted into evidence for jury to view. The DA made no effort to contact co-defendant other than call the co-defendant's place of living the day or at time for his testimony. No subpoenas was sent out to inform co-defendant of the date of trial giving the co-defendant no time to be ready as far as job, et cetera
> ...
>
> If co-defendant was made aware beforehand and didn't show up for court, then evidence could be used according to a section of the Sixth Amendment. The statement by co-defendant that implicated I in crime was submitted for the jury to view.

Evid. Hr'g 86, l. 11-23.  However, this is obviously a reference to a confrontation clause issue, and certainly does not refer to Demarcus being a defense witness.   The confrontation argument was meritless as the statement was never introduced into evidence.  In another letter Petitioner wrote to appellate counsel he states:

> In the police report there's a statement by co-defendant stating the gun is his. That's our way of saying the party was not aware of the other actions. He wasn't not knowledgeable enough in law to know that he must clearly state 'I had no knowledge of the gun whatsoever.' He stated the best way he knew how. He tried to write an affidavit in my behalf but our counsel, Eddie Jackson, informed him it wouldn't be best.

Evid. Hr'g 87, l. 5-12.   This letter does refer to Demarcus providing exculpatory information regarding the gun, but as noted, Mr. Jackson was aware that he could provide this information; however, it was the inculpatory statements he had provided regarding the drugs that had made Mr. Jackson rule him out a defense witness even before any plea agreement had been made.

Thus, Mr. Pitsiri was faced with trial counsel who represented two brothers, and who negotiated a plea agreement with one of them in accord with that brother's statement

to police as it appeared in the probable cause statement attached to the Information in Petitioner's case.  Mr. Pitsiri had before him the colloquy in which Mr. Jackson, when faced with the possibility of Demarcus' plea summary of facts being offered, informed the Court that the he would want to impeach Demarcus' statements therein, causing a possible conflict.  He was also obviously aware that the plea summary of facts was never offered.  Finally, none of the correspondence from Petitioner ever directly or indirectly suggested that the plea kept Demarcus from being a witness on his behalf.  Mr. Pitsiri's notes indicate that he considered the fact that Demarcus had made both inculpatory and exculpatory statements with regard to Petitioner.  Although he cannot now almost five years later recall the exact reason why he did not find the ineffective assistance of counsel issue meritorious, his notes show that he did consider and reject it.  Petitioner questioned Mr. Pitsiri about whether he contacted either Mr. Jackson or Demarcus.  Evid. Hr'g 53-54.  However, had he done so, he would have learned that Mr. Jackson never intended to call Demarcus as a defense witness because he had previously inculpated Petitioner, and Demarcus had no recollection of any defense strategy.  Evid. Hr'g 27, l. 5-14, 18-22; 153, l. 1-5.

## 2.  Appellate Counsel's Actions in Light of the Law

With this in mind, we return to the framework for decision in this case given by the Tenth Circuit Court of Appeals:

> To obtain relief for ineffective counsel, a petitioner must generally show both that his "counsel's representation fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." "When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, we look to the merits of the omitted issue." In conducting this review:

> [i]f the omitted issue is so plainly meritorious that it would
> have been unreasonable to winnow it out even from an
> otherwise strong appeal, its omission may directly establish
> deficient performance; if the omitted issue has merit but is
> not so compelling, the case for deficient performance is more
> complicated, requiring an assessment of the issue relative to
> the rest of the appeal, and deferential consideration must be
> given to any professional judgment involved in its omission;
> of course, if the issue is meritless, its omission will not
> constitute deficient performance.
>
> Consequently, in this case, we must consider the merits of Petitioner's
> claim that his trial counsel was constitutionally ineffective because of a
> conflict of interest.

Hammon, 466 F.3d at 927-28 (citations omitted).

The Sixth Amendment right to effective assistance of counsel includes the "right to representation that is free from conflicts of interest." United States v. Bowie, 892 F.2d 1494, 1500 (10th Cir. 1990) (quoting Wood v. Georgia, 450 U.S. 261, 271 (1981)).  Where, as here, the defendant did not object at trial, the defendant must demonstrate that "'an actual conflict of interest adversely affected his lawyer's performance.'" Bowie, 892 F.2d at 1500 (quoting Cuyler v. Sullivan, 446 U.S. 335, 350 (1980)).  "An actual conflict of interest exists only if counsel was 'forced to make choices advancing ... interests to the detriment of his client.' Furthermore, 'the petitioner must be able to point to specific instances in the record' that suggest his interests were damaged for the benefit of another party." Workman v. Mullin, 342 F.3d 1100, 1107 (10th Cir. 2003) (citations omitted) (quoting United States v. Alvarez, 137 F.3d 1249, 1251-52 (10th Cir.1998)). "[A] mere theoretical division of loyalties" is insufficient. United States v. Carrasco, No. 01-2053, 2002 WL 31846308, at **1 (10th Cir. Dec. 20, 2002)[7] (citations omitted) (quoting Mickens

---

[7] Unpublished disposition cited as persuasive authority pursuant to Tenth Circuit Rule 36.3.

v. Taylor, 535 U.S. 162, 171 (2002)). Therefore, Petitioner must establish that he and Demarcus had adverse or inconsistent interests and point to specific instances in the record that show Mr. Jackson was compromising his interests for the benefit of Demarcus.

One attorney's simultaneous representation of two clients with interests in the same litigation can create the potential for a conflict of interest. See Comment to Rule 1.7, Oklahoma Rules of Professional Conduct, Okla. Stat. tit. 5, Ch. 1, App. 3-A. However, because joint representation of co-defendants only creates a potential conflict of interest, it "is not per se violative of constitutional guarantees of effective assistance of counsel." Burger v. Kemp, 483 U.S. 776, 783 (1987) (quoting Holloway v. Arkansas, 435 U.S. 475, 482 (1978)). In Burger, counsel represented the petitioner, and his partner was appointed to represent the petitioner's co-defendant in his later, separate trial. Id. at 780-81. The petitioner's counsel assisted his partner in the defense of the petitioner's co-defendant. Id. at 781. The two shared research and discussed the cases with one another. Id. Although the petitioner was arguably the less culpable of the two defendants, at trial each defendant sought to emphasize the culpability of the other in order to avoid the death penalty. Id. at 779, 781. The petitioner's counsel prepared briefs for both the petitioner and his co-defendant on their second appeal. Id. at 784.

"Assuming without deciding that two law partners are considered as one attorney," the Supreme Court nonetheless agreed with the lower court's conclusion that there was no actual conflict of interest. Burger, 483 U.S. at 783. Noting that defendants may actually benefit from the joint efforts of two partners, the Court cited the presumption that "the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client." Id. at 783-84. The Court also stated that the separate trials in that case

32

significantly reduced the potential that the interests of the petitioner and his co-defendant would diverge.  Id.

The Court rejected the petitioner's effort to show an actual conflict by his counsel's failure to make the "lesser culpability" argument in the appeal brief: " Given the fact that it was the petitioner who actually killed [the victim] . . . the decision to forgo this issue had a sound strategic basis."  Id.  Additionally, the Court found that "determining that there was an actual conflict of interest requires the attribution of [counsel's] motivation for not making the 'lesser culpability' argument to the fact that his partner was [the co-defendant's] lawyer, or to the further fact that he assisted his partner in that representation."  Id. at 784-85. The Court refused to substitute its speculation for the trial court's finding that counsel was not motivated by the fact that his partner was the co-defendant's lawyer. Id. at 785.

In another Supreme Court decision, it was again emphasized that the "purpose of our Holloway and Sullivan exceptions from the ordinary requirements of Strickland, however, is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where Strickland itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." Mickens v. Taylor, 535 U.S. 162, 176 (2002).  After noting that some Courts of Appeals had "applied Sullivan 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts,'"  the Supreme Court stated:

> It must be said, however, that the language of  Sullivan itself does not clearly establish, or indeed even support, such expansive application. "[U]ntil," it said, "a defendant shows that his counsel *actively represented* conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."

Id. at 174-75 (quoting Sullivan, 446 U.S. at 350) (emphasis added by Mickens).  Thus,

under the teachings of Burger and Mickens, the fact that trial counsel represented both

Petitioner and his brother would not per se constitute ineffective assistance of counsel.

Here, there was no conflict caused by trial counsel negotiating a plea agreement for

Demarcus in which he admitted that the drugs belonged to both he and Petitioner.  First,

Demarcus told police shortly after the arrest that the drugs found in the search were

given to him by Petitioner to hide - making it difficult for him to have taken any different

position at the time of trial.  Second, because of his "fatal" statement regarding the drugs,

and its potential spill over to the gun issue if he were to testify and be impeached with

regard to the drugs statement, Petitioner's defense strategy never involved calling

Demarcus as a defense witness.  Thus, negotiating the plea agreement did not advance

the interests of Demarcus at the expense of Petitioner or deprive Petitioner of a valid

defense strategy that he had up to that point.  Not only is it presumed that Mr. Jackson

was aware of his duty of loyalty, there was evidence that he was aware of it due to the

fact that he discussed the potential of conflict with his two clients, his colleagues, and

the Oklahoma Bar Association.  The undersigned ultimately finds that his decision not

to call Demarcus was motivated by reasons other than a conflict of interest or competing

loyalties.

Thus, the undersigned finds that the issue of ineffective assistance of appellate

counsel due to a conflict of interest, as framed by the Tenth Circuit, is meritless.  There

was nothing in the state trial court record that would have caused a reasonable appellate

attorney to believe that Mr. Jackson was forced to make choices advancing the interests

of Demarcus to the detriment of Petitioner.   Although the plea summary of facts

34

statement Demarcus made regarding the drugs was inculpatory as to Petitioner, it was no more inculpatory (actually less so) than was the statement he had already made at the time of their arrest. There was nothing to indicate that Demarcus was to be a witness on behalf of Petitioner, and Mr. Pitsiri made note of the fact that Demarcus had made both exculpatory and inculpatory statements with regard to Petitioner when he was considering the relative merits of the issues. At most, the record showed a potential conflict of interest that was avoided when the State retreated from its attempt to offer the plea summary of facts of Demarcus.  Because not calling Demarcus had a strong strategic basis not emanating from Mr. Jackson's representation of the two brothers, there was no merit to a conflict of interest claim and Mr. Pitsiri was not ineffective for failing to raise it on appeal.

Petitioner has failed to establish that Mr. Pitsiri performed unreasonably in failing to raise a conflict of interest claim or that there is a reasonable probability that, had a conflict of interest claim been raised, the result of his appeal would have been different. For the reasons set forth above, it is recommended that Petitioner's request for habeas relief be denied.

### RECOMMENDATION

For these reasons, the undersigned recommends that the petition for a writ of habeas corpus be denied. Petitioner is advised of his right to file an objection to this Report and Recommendation with the Clerk of this Court by December 4, 2007, in accordance with 28 U.S.C. § 636 and Local Civil Rule 72.1. Petitioner is further advised that failure to make timely objection to this Report and Recommendation waives his right to appellate review of both factual and legal questions contained herein. Moore v. United

<u>States</u>, 950 F.2d 656 (10th Cir. 1991).  This Report and Recommendation  disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter.

**ENTERED this 14th day of November, 2007.**

DOYLE W. ARGO
UNITED STATES MAGISTRATE JUDGE